## W. L. Wilson v. The State.

### No. 3132. Decided December 6, 1905.

**1.—Murder—Indictment—Bad Spelling—Ungrammatical Construction.**

An indictment for murder which charged that A. C. W. and W. L. W. did then and there unlawfully with *his* malice aforethought kill, etc., is good on motion to quash.

**2.—Same—Evidence.**

On a trial for murder there was no error in admitting testimony which showed that defendant and his brother were talking together just before the killing occurred.

**3.—Same—Evidence—Declaration of Third Party.**

On a trial for murder there was no error in admitting the statement of a third party to deceased to run away, in the hearing of defendant.

**4.—Same—Remarks of Judge—Practice in District Court.**

On a trial for murder, it was not proper for the trial judge to comment on the truth or falsity of a witness' testimony, or make a comment that could be legitimately or naturally construed as such. But see opinion for explanation of the court, however, showing that no reversible error · was committed in this respect.

**5.—Same—Dying Declaration—Res Gestae.**

On a trial for murder, testimony that deceased within twenty minutes after the difficulty made the following statement, to wit: "What a pity! What a pity! They killed me for nothing. What will become of my poor wife and children?" was admissible as res gestæ. However that portion of the declaration, "What will become of my poor wife and children?" was not admissible.

**6.—Same—Evidence—Means Used—Stick of Wood—Comparison.**

On a trial for murder, where the evidence showed that the deceased struck defendant with a stick of pine wood which had been lost, it was error to exclude a stick offered by defendant to be compared by his witness with the stick the deceased had used at the time he was killed, and this although the defense did not offer this testimony until his last witness was placed on the stand, and many of the State's witnesses had been discharged.

**7.—Same—Parties Jointly Indicted Cannot Testify for Each Other.**

Where two parties are jointly indicted for murder, and one had been tried and convicted and his case reversed and change of venue made to another county where he had not been retried, he could not testify for his codefendant.

**8.—Same—Declaration of Deceased—Consciousness—Insanity—Charge of Court.**

On a trial for murder, it was not necessary to submit a charge leaving the issue of sanity or consciousness of the deceased to the jury, when he made the declaration, that he was killed for nothing, etc., the declarations being res gestæ. Davidson, Presiding Judge, dissenting.

**9.—Same—Implied Malice—Charge of Court.**

See opinion for correct charge on implied malice and murder of the second degree.

**10.—Same—Charge of Court—Principals.**

On a trial for murder, where the evidence showed that at the time of the homicide defendant and another were acting together in the fight in which deceased lost his life, a charge on the law of principals was proper.

**11.—Same—Aggravated Assault—Statutes Construed—Charge of Court.**

On a trial for murder where the evidence did not show the size and character of the knife or knives with which the wounds were inflicted that caused deceased's death, it was the duty of the court under articles 717 and 719, Penal Code, to charge on the law of aggravated assault.

**12.—Same—Argument of Counsel.**

See opinion where the court again enjoin upon counsel for the prosecution, the rule, to confine their remarks to the evidence adduced.

Appeal from the District Court of Camp. Tried below before Hon. P. A. Turner.

Appeal from a conviction of murder in the second degree; penalty, seven years imprisonment in the penitentiary.

The main State's witness describes the difficulty as follows: "Harrell the deceased was running or backing off while the two Wilsons were cutting at him with knives. He was backing off from them and striking with his hand to and fro, backing as fast as he could and they were cutting at him with knives. Harrell reached down and grabbed up a little piece of cracker-box or possibly it might have come off of a whisky case, or something of that kind, and struck at the Wilsons with it and was striking at them and waving the stick to and fro. They made a circle, this way, possibly of a hundred and fifty feet, and circled back to about where the difficulty commenced. Harrell was still backing and backed over a knoll and fell to the ground; his head being south· and his feet north. This threw the defendant southeast of Harrell. Harrell was kicking at Doctor Wilson with his feet and striking with his hands. Doctor Wilson was a little off on the west side of him, and the defendant then ran up, reached over and struck Harrell with a knife in the left breast—kinder jerked the knife and

jumped back. That lick seemed to unnerve Harrell and he relaxed the kicking and striking with his hands. Then Doctor Wilson came over on the west side of Harrell, reached down, placed his knife against Harrell's side, or breast, and deliberately pushed it into him. I then grabbed Doctor Wilson by the hand and pulled him off. When I grabbed his hand he had his knife in it and the knife was in the body of Harrell. Some one else in the meantime had caught the defendant * * * Harrell then got up. I do not know that I noticed any blood. I noticed the knife that Doctor Wilson had and think it was a physician's knife, with a blade about three inches long. Harrell was on his back on the ground when Doctor Wilson cut him. After I pulled Doctor Wilson off and some one got ahold of the defendant, Harrell got up and walked south to the corner of the store, possibly thirty or forty feet; he then turned around and came back by the place where we were; I still had hold of Doctor Wilson and he asked me not to let Harrell hurt him any more. * * * Harrell sank down while walking across the square and was placed on a cot and carried into the drug store. I did not see the first difficulty."

There was a conflict of testimony as to whether deceased was conscious when he uttered the words that they killed him for nothing, etc. Defendant's testimony showed that the deceased struck Doctor Wilson who fell back sideways and that he drew back his fist and struck at some one else. There was also testimony that deceased struck the first blow, knocking down Doctor Wilson, and then turned and immediately knocked down the defendant and they then engaged in a fight. That deceased used a piece of plank and hit the defendant across the head and shoulders and knocked him down again, and the fight continued, etc.

Defendant testified that he and deceased had been good friends up to the time of the difficulty. * * * "Harrell and my brother were standing in front of the drug store or restaurant talking. Just before I reached them Harrell started off, etc. I then called to my brother and told him that I wanted some medicine for mother; just at this instance Harrell, who had walked off about twenty feet, turned and came back and pointed his finger towards my brother's face saying, 'Here.' My brother turned and faced him and Harrell's finger struck against my brother's nose. I do not think however that Harrell intended to strike him with his finger. Harrell then said that he had told him what he could do, and that it was all he intended to do. My brother then said something in reply to Harrell and Harrell knocked him down. I did not know what they were talking about. I had not seen my brother before on that day. When Harrell knocked my brother down I tried to catch him to stop the difficulty; he was following up the lick and going onto my brother. * * * Harrell then got on me as I was trying to get up and had a brick-bat in his hand with which he was trying to hit me on the head. He threw the brick-bat and hit me on the head. He had hold of the back of my neck

with one hand while I was on my all fours, and he drug me a little piece into the street and picked up a piece of plank. As he got up with the piece of plank he knocked me down with it. As I rose the second time I opened my knife and he struck at me again with his stick and I ran in under it. The second lick of the stick went over my shoulder. The first lick he hit me with the plank was on the left side of the head across the ear, and the scar is still on my head and ear to show for the lick. After I run under the stick, Harrell and I got separated again and Harrell fell. J. A. Starr then took hold of me and told me to put up my knife and I did so. * * * If I cut Harrell at all I cut him while we were standing up, and while he was trying to knock me in the head with a piece of plank. I don't know whether I cut him or not, but I tried to do so to defend myself. * * * I did not cut him after he fell. I did not know what Harrell and my brother were talking about and had no idea on earth that they were to have a difficulty. * * *""

The above statement together with that in the opinion substantially states the case.

*J. R. Warren, F. J. McCord, Hooper & Zachry, Barnwell & Eberhart,* for appellant.—In a prosecution for murder, where two persons are jointly indicted, evidence of a previous general conversation between the accused at the place where the homicide afterwards occurred is not admissible, unless it is shown that such conversation referred to the deceased or was in some way connected with the killing. The State having failed to show a conspiracy, it is error to admit testimony as to the acts, conversation and whereabouts of the accused unless same are shown to be connected with the deceased or with the killing. Goodwin v. State, 38 Texas Crim. Rep., 466; Fossett v. State, 55 S. W. Rep., 497; Holley v. State, 46 S. W. Rep., 39; Heffington v. State, 54 S. W. Rep., 755; Hall v. State, 64 S. W. Rep., 248; Gaines v. State, 53 S. W. Rep., 623.

The remarks or observations of a crowd present at the scene of a difficulty are not res gestæ, but are hearsay, and are not admissible. Holt v. State, 9 Texas Crim. App., 571; Felder v. State, 23 Texas Crim. App., 477; Ex parte Kennedy, 57 S. W. Rep., 648.

The trial judge should never comment upon the weight of the testimony in the presence of the jury, and his doing so is reversible error. A remark made by a presiding judge in the hearing of the jury will have precisely the same effect as if given as a formal instruction. Art. 767, Crim. Code Proc.; White's Ann. Stats. and authorities there collated; Moore v. State, 26 S. W. Rep., 403; 21 Enc. of Pl. & Pr., p. 994.

The court erred in permitting the witness, Dr. T. S. Ragland, to testify, over the objections of this defendant, to what purported to be a dying declaration alleged to have been made by A. W. Harrell a short while before his death, because said statements were not shown. Bateson v. State, 80 S. W. Rep., 88.

It being an issuable fact as to whether Harrell was sane at the time he is alleged to have made certain declarations admitted in evidence, the matter should have been properly guarded by appropriate instructions. The jury should have been charged not to consider any statements made by Harrell unless they believed from the evidence that he was sane at the time such statements, if any, were made. Roberts v. State, 88 S. W. Rep., 221; Sims v. State, 36 S. W. Rep., 256.

The law of principals should not be given to the jury unless the facts raise such issue.

There were no facts in evidence to support such a charge and the action of the court in presenting same to the jury was highly prejudicial and injurious to the rights of the defendant and was reversible error. Floyd v. State, 29 Texas Crim. App., 341; State v. Kenedy, 75 S. W. Rep., 979.

The court erred in failing and refusing to give to the jury special charge No. 9, requested by the defendant as follows: "You are charged that you should not consider, but should disregard, the remarks of T. H. Briggs, one of the private prosecutors herein, in his argument as follows: 'Don't let the news go back to Upshur County that the murderers of Bud Harrell have been acquitted.' There was no testimony to authorize such remarks; and in making up your verdict you should disregard such remarks and look alone to the testimony as given by the witnesses." Fuller v. State, 30 Texas Crim. App., 559; Hatch v. State, 8 Texas Crim. App., 416; Eanes v. State, 10 Texas Crim. App., 421; Crawford v. State, 15 Texas Crim. App., 501; Cartwright v. State, 16 Texas Crim. App., 473; Hunnicut v. State, 18 Texas Crim. App., 498; Warthan v. State, 55 S. W. Rep., 63; Wilson v. State, 81 S. W. Rep., 34.

*Howard Martin,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment fixed at seven years confinement in the penitentiary.

This is a companion case to that of H. C. Wilson v. State, decided at the Austin Term, 1905.

Appellant filed a motion to quash the indictment, because the charging part reads, "That H. C. Wilson and W. L. Wilson did then and there unlawfully with *his* malice aforethought kill." It is a well-known rule that bad spelling and ungrammatical construction will not vitiate an indictment. It clearly appears that both appellant and H. C. Wilson are charged with killing deceased with malice aforethought.

He also complains the court erred in permitting Nev Sorrells to testify, over the objection of appellant, that appellant and his brother (H. C. Wilson) were standing in front of W. C. Barnwell's drugstore in Gilmer, Upshur County, where the difficulty occurred. In this there was no error. The testimony of this witness shows that appellant

and his brother were talking together just before the killing occurred. It may be that this was an innocent conversation, as appellant insists, but this would not preclude a converse inference by the jury, and hence it was a fact legitimately provable by the State. What has been said above also applies to the bill reserved to the testimony of C. W. Douphrate to the same effect.

The eighth error assigned complains that the court permitted Jim Starr, over appellant's objection, to testify that during the progress of the fight, he spoke to A. W. Harrell (deceased) in a loud voice, and said, "Bud, God damn it, run out of it." The bill presenting this matter shows that both appellant and his brother heard the statement. In this there was no error.

The ninth error complains that while J. H. Starr, a witness for the State, was being cross-examined by appellant, he was asked to state whether this defendant went to deceased, after he fell, and in response to said question, witness answered: "If he did, I did not see him." Thereupon appellant's counsel asked, if he could not answer the question positively. Witness reiterated, "I think it is positive enough; it looks to me like it is." The court thereupon remarked, "I think he has answered it as fully as he can. Things will happen that a witness ought to see, still sometimes they may not see it." Appellant excepted to the remark of the court. Thereupon the court stated, "He answered it in my opinion as honestly as a witness can answer." Appellant objected to said remarks on the ground that it prejudiced the rights of appellant. The court states in his explanation to this bill: "The witness had stated minutely all the surroundings; he had stated fifteen or twenty times, if defendant cut deceased after he fell, and while he was on the ground he did not see it. He had stated as often his opportunities to see it. Defendant was trying to force him to swear to a conclusion that it was impossible for defendant to have cut deceased while he was down without the witness seeing it. Witness had testified fairly, had shown no disposition to evade, and was willing to tell all he saw and heard. After harassing the witness for ten minutes on this point, I thought it was time to stop it, and proceed with the trial. Witness and the court had shown great patience in the cross-examination on this point before interfering to stop it, and proceed with the trial." The rules of procedure in this State require that trial courts should studiously avoid any comment upon the weight of the evidence, while ruling on the admission of testimony; or in charge to the jury. In view of the explanation of the court we cannot see there was such error as authorizes a reversal. After the witness answered the question, it is legitimate for the trial court to say so, and as indicated by the bill, stop any harassment of the witness. It is not proper for the court to say anything indicative of the fact that the court believed the witness is honest or dishonest. It is proper for trial court to protect a witness against any supposed imposition or badgering; but it is not proper to comment on the truth or falsity of

the witness' testimony, or make a comment that can be legitimately or naturally construed as such.

The fifteenth error assigned, insists the court erred in permitting Dr. T. S. Ragland, to testify to what purported to be a dying declaration, alleged to have been made by A. W. Harrell, deceased, a short while before his death, because said statement was not shown to have been a part of the res gestæ, and did not come within the rule prescribed by law for the introduction of dying declarations. The bill shows that deceased had gone something like two hundred feet after the difficulty to Ferrell's drugstore, and within twenty minutes after the difficulty had ended, made the statement complained of. State's counsel asked the witness, the following question: "Doctor, in your opinion, was deceased conscious? A. 'Yes, sir.' Q. 'What did he say?' A. 'Now, all this was said in monosyllables; that is, two or three words at a time. The first thing he said was, 'What a pity! What a pity! They killed me for nothing. What will become of my poor wife and children.' He then turned to me, or Dr. Daniels, I don't remember which, and said, 'Dr., can't you do nothing for me?' We just told him to be quiet.'" To support appellant's contention he refers us to Bateson v. State, 80 S. W. Rep., 88, where it was held the statement of deceased, "that they murdered me without cause" was improperly admitted, because a witness can only state matter involved in the dying declaration to which deceased could have testified as a witness if alive, and could not give in evidence matters of opinion; and also cited Medina v. State, 43 Texas Crim. Rep., 52; 63 S. W. Rep., 331. In Roberts v. State, 5 Texas Crim. App., 141, we held, where witness testified, "Alexander stated that Steve Roberts killed him for nothing," that said declaration was not an opinion. In Sims v. State, 36 Texas Crim. Rep., 154, we held the following declaration admissible: "Sims ought not to have shot me, and I did not think Sims was going to shoot." See also Connell v. State, 46 Texas Crim. Rep., 259; 10 Texas Ct. Rep., 890; sec. 1008, White's Ann. Code Crim. Proc. We think the declaration here, under the last cited authorities, was admissible, and not an opinion of the witness. However, that portion of the declaration which says, "What will become of my poor wife and children?" was not admissible. Cravens v. State, just decided. We think appellant is correct in his insistence that the testimony was not admissible as dying declarations but was admissible as res gestæ, since the same occurred within fifteen or twenty minutes after the fatal stab was inflicted. Witness did not testify that deceased knew he was dying, although he did die immediately.

The 18th error complains that while R. C. Barnwell, a witness for defendant, was testifying, appellant's counsel proposed to exhibit to said witness a stick of native pine wood, about two and one-half inches wide, at one end, and about one and a half inches wide at the other end, and three-quarters of an inch thick, and asked the witness how said stick compared with the one which he (witness) had testified that

deceased had used in the difficulty at the time he was killed. Appellant offered further testimony to show that the original stick had been turned over to the district clerk of Upshur County, for safe keeping, but had been lost. Appellant then offered to prove by witness that the stick proposed to be exhibited to him was about the same size, width and material as said original stick. Whereupon the court asked attorney for appellant, if the stick which he proposed to exhibit was the one used by deceased at the time of and in the difficulty; and when defendant's counsel informed the court that it was not the original stick, the court of his own motion, instructed the jury that they would pay no attention to said stick, and thereupon ordered the sheriff of Camp County to take said stick out of the courthouse. The witness was not permitted to examine the stick, nor to testify in any way in regard to the same. Had the witness been permitted, he would have stated that the stick shown him was about the same size and character and material as the one used by deceased in the difficulty with appellant and his brother. Appended to this bill is the following explanation: "This was one of the last witnesses introduced by defendant. A large number of witnesses had testified and had described the stick. The State had closed and defendant was about ready to close. Defendant had this stick before the trial commenced. For some time they had displayed it before the jury. I supposed it was the stick used by Harrell and the jury were watching. Attorneys representing the State objected to its display before the jury. To have allowed this witness to testify would have made it necessary for the State to reintroduce a large number of witnesses and a great many of them had been excused and gone home, probably twenty witness had already testified describing the stick. This was at the very close of the case. It would not have been fair under these circumstances to allow this witness to compare the stick offered with that used by Harrell." We do not think the court was correct in excluding the testimony or the stick. If as stated in the explanation, probably twenty witnesses had already described the stick, it certainly would not be necessary to bring said witnesses back to redescribe the stick. We know of no rule of law that limits appellant' in the manner here shown, in the introduction of his testimony. If the stick was not similar to the one used by deceased on the day of the difficulty, then the testimony, as stated in the explanation, would clearly have shown that said witness' statements were untrue. On other hand, if the stick comported with the testimony of the other witnesses, it was legitimate testimony to go before the jury for whatever weight it might have. Appellant insists that deceased was attempting to strike and did strike him with a stick. The character and weight thereof was certainly a material inquiry in the course of this trial, and as to when the testimony was introduced, is a matter that we do not believe the discretion of the court can determine. It follows, therefore, that the court erred in rejecting this testimony.

Appellant's 23rd assignment complains that the court erred in re-

fusing to permit H. C. Wilson to testify to any facts whatever, on the ground that he was jointly indicted with appellant. The fact as to this matter are about as follows: H. C. and W. L. Wilson were jointly indicted for this offense. H. C. Wilson's case had been reversed by this court, ·he having previously been convicted in the district court. He had not been retried. The venue of H. C. Wilson's case was changed to Wood County, and appellant's changed to Camp County. Under this state of facts, we do not think the court erred in refusing to permit H. C. Wilson to testify in this case.

The 25th assignment complains that the court erred in failing to charge the jury on the following matter: Appellant insists that it was a controverted point in the evidence whether A. W. Harrell (deceased) was conscious and sane at the time he is alleged to have made certain statements, just a short while before his death, as testified by Drs. Ragland, Ferrell and Roberts. The evidence on this point was conflicting, appellant insists, and the jury should have been charged that they could not consider said statements alleged to have been made by deceased to wit: "What a pity; what a pity, they killed me for nothing," unless they should believe from the evidence beyond a reasonable doubt that when said statement was made, deceased was conscious and sane of mind. We do not think such a charge was required. The majority of this court have heretofore held that the competency of the declarant is not requisite in order to prove in res gestæ declarations, therefore this was not an issue in the case. Kenney v. State, 9 Texas Ct. Rep., 889.

The 27th assignment complains of the following portion of the court's charge: "Implied malice is constructive malice, and not a fact to be proved specifically. It is an inference or conclusion founded upon the facts and circumstances of the case as they are ascertained to exist, thus: When the proof shows an unlawful killing, and no evidence has been adduced establishing the existence of express malice on the one hand, or which tends to establish any justification, excuse or mitigation on the other, the law implies malice, and the murder is of the second degree. But in this connection you are charged that, where an indictment charges murder on implied malice alone, and the evidence establishes or tends to establish express malice as a fact, it is not to be understood that such proof would on the one hand be incompetent nor on the other that it would create a variance from the allegation in the indictment; but such evidence, notwithstanding it shows express malice, would in such case be sufficient to warrant a conviction for murder in the second degree, since express malice comprises and embraces implied malice, just as murder of the first degree embraces murder of the second degree." This charge is correct.

We do not think, as appellant insists in his 45th assignment, that the court erred in charging on the law of principals, since evidence shows that at the time of the homicide appellant and his brother H.

C. Wilson, were acting together in the fight in which deceased lost his life.

Appellant complains that the court erred in failing to charge the jury on the law of aggravated assault. We think the court should have charged on aggravated assault. The evidence does not show the size and character of the knife or knives with which the wounds were inflicted that caused deceased's death. The testimony indicates it was a common pocket-knife. This being true, it was the duty of the court, under articles 717 and 719, Penal Code, to charge on the law of aggravated assault. An inspection of these articles shows that the instrument or means by which the homicide is committed are to be taken in consideration in judging of the intent of the party offending. If the instrument be one not likely to produce death, it is not to be presumed that death was designed, unless from the manner in which it was used such intention evidently appears. Furthermore, where a homicide occurs under the influence of sudden passion, but by the use of means not in their nature calculated to produce death, the person killing is not deemed guilty of the homicide, unless it should appear that there was an intention to kill, but the party from whose act the death resulted may be prosecuted for and convicted of any grade of assault and battery. It follows from these articles, in the light of the evidence here that, if the jury should believe from the evidence that appellant while laboring under the influence of sudden passion, used a weapon not in its nature calculated to produce death, then the law will not deem defendant guilty of homicide unless it appears there was an intention to kill. Then, if appellant did not have the specific intent to kill, he might be guilty of aggravated assault, or assault and battery, as the case may be. If appellant inflicted a serious wound upon deceased, it would be merely the duty of the court to charge on aggravated assault; but if the evidence should show that the wound was not a serious one, then it would be the duty of the court to charge on simple assault and battery. However, we have discussed these statutes so often that we refer to the decisions of this court for a further discussion of the same.

Appellant further complains of the argument of private counsel for the State. We do not deem it necessary to discuss the same. However, we again enjoin upon counsel for the prosecution to confine their remarks to the evidence adduced.

For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

DAVIDSON, Presiding Judge.—I cannot agree that statements of insane persons can be used as evidence directly or indirectly. The insane party cannot testify. If he cannot, then his statement cannot be used. The statute inhibits such testimony.